

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

CAUSE NO. 3:91-cv-227RP

PRINCESS R. SPENCER,

*Plaintiff,*

*v.*

CITY OF ELKHART, et al.,

*Defendants.*

ENTRY FOR April 26, 1995

## MEMORANDUM AND ORDER

The plaintiff, Princess R. Spencer, a female African-American, was employed as a patrol officer by the Elkhart Police Department ("EPD") from February 20, 1987, until she was terminated on March 19, 1991. She commenced the present action on May 20, 1991, pursuant to 42 U.S.C. § 1983, claiming that the City of Elkhart (the "City"), the EPD, and various individual defendants violated her right to freedom of speech under the First Amendment, as well as her rights to due process and equal protection under the Fourteenth Amendment. She later added a state law defamation claim against the City and Mayor James P. Perron. This case is now before the court on defendants' Motions for Summary Judgment.

*Background*

Spencer was hired by the City as a third class patrol woman on February 20, 1987, and was initially assigned to the afternoon shift for field training with Field Training Officer Fred Eichorn.   On April 20, 1987, she enrolled at the Indiana Law Enforcement Academy (the "Academy") for 12 weeks of training.   Upon the successful completion of her academy training on July 17, 1987, she returned to the EPD and resumed her field training on the afternoon shift with Officer Eichorn.

In the fall of 1987, Spencer was assigned to ride with Frank Owens, the EPD's field training officer on the midnight shift.   After six to eight weeks of field training with Owens, Spencer was assigned to another shift with Field Training Officer Pam Westlake. Spencer was promoted to second class patrolwoman on February 20, 1988, and first class patrolwoman on February 20, 1989.

During her employment at the EPD, Spencer was given disciplinary suspensions on four occasions:  one day in November, 1988, for pointing a firearm at a fellow officer; five days in March, 1989, for use of unnecessary force or violence; five days in May, 1990, for neglect of duty; and three days in October, 1990, for insubordination (Affidavit of Barbara Paolillo, Exhibits A, B, H-1 to N-2, KK, OO.) On December 13, 1990, Spencer was charged with neglect of duty and conduct unbecoming an officer.  Following a hearing, the Elkhart Board of Public Safety (the "Board") found her guilty of neglect of duty and terminated her employment on March 19, 1991.  (Affidavit of Princess R. Spencer, ¶¶ 5, 6, 12 and 15;

2

Plaintiff's Ex. 321-24 and 328-37; Deposition of Princess R. Spencer III, Defendant's Ex. B-1-15; Defendant's Ex., Vol. II, Tab 4, Ex. B-1-15.)

In addition to suing the City, Mayor Perron and the EPD, Spencer named a number of individual defendants, including Thomas Cutler, Chief of the EPD from the time Spencer was hired until May, 1990; John Ivory, who succeeded Cutler as Chief of the EPD in May, 1990; Frank Owens, a Sergeant on the EPD's midnight shift; John Lerner, another Sergeant on the midnight shift; Larry Kasa, Captain of the Uniform Division; Tom Dewitt, supervising officer of the EPD's midnight shift; Assistant Chief Thomas Balyeat; and Robert Crise, a Lieutenant on the midnight shift.

In her Amended and Supplemental Complaints, Spencer alleges that shortly after beginning her employment at the EPD, "defendants embarked upon a course of discrimination and harassment" based upon her gender and race. Throughout most of the relevant time, Spencer was one of 10 female officers and 9 black officers out of approximately 100 officers on the EPD. Spencer alleges that she was subjected to embarrassing and belittling sexual remarks, sexual advances, unfair punishment, denial of recognition, and denial of access to the established grievance procedure at the EPD. (Second Amended Complaint, Counts II and III.)

*Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *U.S. v. Lair*, 854 F.2d 233, 235 (7th Cir. 1988). Rather, the party opposing the motion must "affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987). "A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." *Celotex Corp.*, 106 S.Ct. at 2553.

"Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity -- depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987) (quoting *Martz v. Union Labor Life Insurance Co.*, 757 F.2d 135, 139 (7th Cir. 1985)). Affidavits presented in opposition to a motion for summary judgment must be based upon

4

personal knowledge; a statement merely indicating that a purported affidavit is based upon "information and belief" is insufficient. *Price v. Rochford*, 947 F.2d 829, 832-33 (7th Cir. 1991); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989); *Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. 1519, 1526 (N.D. Ind. 1991). Rule 56(e) requires that any affidavits "set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Inadmissible hearsay contained in affidavits may not be considered. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985), *cert. denied*, 475 U.S. 1107 (1986). Conclusory statements or indications of opinion or belief offered without any factual support are also insufficient to create a genuine issue of fact. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992); *Covalt v. Carey Canada, Inc.*, 950 F.2d 481 (7th Cir. 1991); *Mestayer v. Wisconsin Physicians Service Ins. Corp.*, 905 F.2d 1077, 1079 (7th Cir. 1990); *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983).

"Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." *Common v. Williams*, 859 F.2d 467 (7th Cir. 1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032

(7th Cir. 1988). The inquiry involved in ruling on a motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. *Anderson*, 106 S.Ct. at 2512. All factual inferences must be drawn in favor of the non-moving party. *Valley Liquors Inc.*, 822 F.2d at 659.

## Evidentiary Submissions

Both the City and the individual defendants argue that documentary evidence and affidavit testimony submitted by Spencer is not properly before the court and, therefore, cannot be considered when determining the propriety of their Motions for Summary Judgment. With respect to the documentary evidence, defendants have listed those documents they believe are not admissible based upon a lack of authenticity. After a review of the record, the court finds that many of the documents submitted by Spencer have not been properly authenticated and thus cannot be considered under Rule 56(e) of the Federal Rules of Civil Procedure.[1] *Friedel*, 832 F.2d at 970; *Martz*, 757 F.2d at 138; *Gonzales v. North Township of Lake County*, 800 F.Supp. 676, 680-81 (N.D. Ind. 1992); *Roloff v. Sullivan*, 772 F.Supp. 1083, 1088-89 (N.D. Ind. 1991); *Bee v. Local 719, United Auto Workers*, 744 F.Supp. 835, 836 (N.D. Ill. 1990). However, to the extent that defendants have submitted a number of the same documents as their own exhibits, they will not be heard to claim a lack of authenticity. The court will, accordingly, consider the following exhibits which have been submitted by Spencer: 3-4, 8-14, 21-24, 26-29, 30, 35-37,

---

[1]Spencer argues that some of these documents are admissible because she personally obtained photocopies of them from the files of the EPD. However, Spencer has not indicated which documents, in particular, were obtained by this method.

6

39, 40-41, 44-45, 48-49, 53-58, 63-65, 80-94, 261-67, 269-86, 292-94, 299-305, 307-12, 314-15, 320-24, 328-37, 414-18, 463, 478 (a)-(d), 478 (lllll), 479, 507-08 and 542-722.

### Affidavit of William Kraus

Defendants argue that the affidavit of Officer William Kraus is riddled with immaterial testimony, which they believe is confirmed by the fact that only ¶¶ 9, 22 and 23 of the affidavit are referenced in Spencer's Amended Statement of Material Facts. Spencer contends that the testimony in Officer Kraus' affidavit is relevant because the jury could infer that Lieutenant Robert Crise instructed Spencer and Kraus to refrain from socializing due to the fact that Spencer is a female. The court finds that Kraus' testimony is admissible, but of little weight or value in evaluating Spencer's discrimination and harassment claims.

### Affidavit of Kenneth Montgomery

There are only two paragraphs in Officer Kenneth Montgomery's affidavit that contain testimonial evidence. Paragraph 2 states: "During my tenure as a member of the EPD in my presence Officer Frank Owens stated that Officer Spencer was good for only one thing, having her legs in the air for a good fuck."

Paragraph 3 states:

During the month of June, 1991 while working the day shift at the EPD Officer Nancy DeWitt in my presence stated that Captain Larry Kasa had a problem with females and minorities. That Princess Spencer's problems stemmed from being a female and

7

being a minority and that her firing was mainly due to working the midnight shift and having a Sergeant who did not want her on the shift or on the police force.

Defendants argue that ¶ 2 is inadmissible because it does not indicate the specific date when the incident occurred. Defendants further argue that the affidavit does not indicate that Spencer was present at the time the comment was made and thus the comment could not have contributed to a sexually hostile work environment. Defendants also maintain that ¶ 3 is inadmissible hearsay. Spencer, however, asserts that ¶ 2 evidences intent, motive and knowledge of discriminatory treatment, and is therefore admissible under Fed.R.Evid. 404(B). She also maintains that ¶ 3 is admissible as an admission of a party opponent under Fed.R.Evid. 801(2)(D).

Although ¶ 2 contains specific facts, it includes no time reference and is thus entitled to no weight. Lastly, ¶ 3 is inadmissible under Rule 801(d)(2)(D), because Officer Nancy DeWitt has not been shown to have been the agent or servant of Captain Kasa. Paragraph 3 of the Montgomery affidavit will not be considered.

### Affidavit of Ann Woods

Defendants contend that the affidavit testimony of Ann Woods is irrelevant to a determination of whether Spencer was subjected to discrimination or a sexually hostile work environment. Specifically, defendants argue that the matters referred to in Woods' affidavit have no bearing on action because they occurred over eight years ago. Spencer, however, maintains that they represent proof of intent and knowledge of harassing behavior on the part of

defendants, and that the affidavit testimony is admissible under Fed.R.Evid. 401, 402 and 404(B). The court finds that the Woods' affidavit is admissible to show discriminatory intent and harassing behavior, notwithstanding that Spencer was not present when the statements were made, and the fact that the events occurred outside of the limitation period. *See United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which has not made the basis of a timely charge . . . may [nevertheless] constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."); *Noland v. McAdoo*, 39 F.3d 269, 271-72 (10th Cir. 1994); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 671 (7th Cir. 1993); *Lenoir v. Roll Caoter, Inc.*, 841 F.Supp. 1457, 1465 (N.D.Ind. 1992); *Leffingwell v. Sears, Roebuck & Co.*, 717 F.Supp. 620 (N.D.Ill. 1989); *Minority Police Officers v. City of South Bend*, 617 F.Supp. 1330, 1333 (N.D.Ind. 1985). The court will consider Officer Woods' affidavit in its entirety.

### Affidavit of Sue I. Morland

Defendants maintain that the affidavit of Sue I. Morland should not be considered because her testimony concerns events which occurred no later than February, 1989, outside the relevant statutory time period. Again, however, the court finds that the statements in question are admissible to show discriminatory intent and to describe Spencer's work environment. *Lenoir*, 841 F.Supp. at 1465; *Leffingwell*, 717 F.Supp. at 620; *Minority Police Officers*, 617 F.Supp. at 1333. Therefore, the court will consider the affidavit of Officer Morland in its entirety.

9

Affidavit of James D. Stevens

Defendants assert that the affidavit of Attorney James D. Stevens is inadmissible because it is riddled with immaterial testimony and because it is not based upon Stevens' personal knowledge. The court, nevertheless, concludes that the matters described in Stevens' affidavit are material to the question of whether Spencer was treated differently, in terms of discipline, from other officers and that the testimony is properly based upon Stevens' personal knowledge. Accordingly, the affidavit will be considered in its entirety.

Affidavit of Marvin Johnson

Defendants' objections to the affidavit of Marvin Johnson are similar to those raised with respect to the Stevens' affidavit. Defendants argue that Officer Johnson had no specific knowledge of other EPD officers who were similarly situated to Spencer and who failed to appear in court, and that Johnson had no knowledge of the reason why Spencer was reprimanded and reassigned to desk duty. Again, the court cannot agree. Spencer need not prove her entire case in each affidavit, and Officer Johnson need only have personal knowledge with respect to the factual assertions in his affidavit. Therefore, the court will consider the affidavit of Officer Johnson in its entirety.

Affidavit of Ernie Hill

Defendants also challenge the admissibility of certain portions of the affidavit of Ernie Hill. According to defendants, ¶¶ 2, 5, and 8 are inadmissible because they contain legal conclusions and opinions and do not provide support for the existence of a custom or policy of racial or sexual discrimination at the EPD. Defendants further assert that ¶¶ 9, 15, 16 and 18 are inadmissible because they contain broad generalizations; that ¶¶ 2, 3, 5, 11 and 12 are inadmissible because they contain conclusory statements unsubstantiated with specific facts and lack evidence of personal knowledge; and that ¶¶ 5 and 18 are inadmissible because they do not contain specific dates of when the incidents of racial and sexual discrimination occurred. Defendants maintain that Officer Hill's entire affidavit should be disregarded because inadmissible matters are interwoven with admissible evidence. Spencer, however, argues that Officer Hill personally observed the events described in his affidavit; that Hill's observations create inferences that she was subjected to discrimination, harassment and hostile work environment while employed at the EPD; and that his testimony is admissible under Fed.R.Evid. 402, 404(B), 406 and 801(d)(2).

It is apparent that some of Officer Hill's testimony contains legal conclusions and opinions, specifically the first, second, third and fifth sentences of ¶ 2 and the last sentence in ¶ 7. Those portions cannot be considered. The court will also disregard ¶¶ 3 and 11 in their entirety because they lack specificity. However, the court will consider ¶¶ 5, 9, 12, 15, 16 and 18 of the affidavit when determining the propriety of the Motions for Summary Judgment.

11

These paragraphs are based on Officer Hill's personal observations while employed as a patrol officer by the EPD.

Affidavit of Princess Spencer

Defendants also contend that certain statements in Spencer's affidavit are inadmissible because of a lack of personal knowledge or competency to testify on certain matters; that the statements are either conclusory, legal opinions or based on speculation; and that the incidents related are unidentified by date or clearly outside of the relevant statutory time period. Arguing that inadmissible evidence is interwoven with admissible evidence, defendants urge the court to disregard her entire affidavit.

Preliminarily, the court notes that those portions of Spencer's affidavit which rely upon exhibits which have not been found to contain admissible evidence will not be considered in ruling on the Motions for Summary Judgment. Those exhibits include: 1, 15-20, 25, 31-34, 38, 42-43, 46-47, 50-52, 59-62, 66-67, 69-86, 106-22, 137, 258-59, 313-13(e), 337, 464, 478(kkkkk) and 509-41. Therefore, to the extent that Spencer relies upon those exhibits in her affidavit, and not upon personal knowledge, her testimony will not be considered by the court. Accordingly, the court will not consider ¶¶ 13, 31 and 44 of Spencer's affidavit. Paragraph 5, however, is rendered admissible by defendants' exhibit B-9. The court will also consider ¶¶ 9-12 and 18-21, because that testimony appears to be based upon personal knowledge and contains facts with sufficient specificity to warrant consideration. Lastly, ¶ 2 need not be considered because it is not material to the issues in this case. The court again rejects defendants' argument

12

that portions of the affidavit are inadmissible because they are concerned with incidents outside the relevant statutory time period.

### Affidavit of Velda Harrison

Mayor Perron asserts that the affidavit of Velda Harrison cannot be considered because it contains inadmissible hearsay. The court must agree. The affidavit of Velda Harrison, accordingly, will not be considered.

### *Claims Against the EPD*

It is clear that Spencer cannot maintain an action against the EPD. Under Indiana law, the EPD is not recognized as a legal entity. As this court noted in *Jones v. Bowman*, 694 F.Supp. 538, 544 (N.D. Ind. 1988): "A city's police department is merely a vehicle through which the city government fulfills its policy functions and is not a proper party defendant." *See Common Council of City of Peru v. Peru Daily*, 440 N.E.2d 727, 729 (Ind. Ct. App. 1982); *Coleman v. City of Gary*, 220 Ind. 446, 44 N.E.2d 101, 108 (Ind. 1942). *See also Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit."). Accordingly, Spencer's action against the EPD must fail.

*General Standards of Liability Under § 1983*

Spencer's First Amendment claims, her claims of racial and sexual discrimination and harassment and her due process claims are brought under § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To prevail on her claims under § 1983, Spencer must establish that: "'(1) [she] held a constitutionally protected right; (2) [she was] deprived of this right in violation of the constitution; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of [state] law.'" *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir. 1990) (quoting *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988)). It is fundamental that in the absence of a violation of a federal right, there is no basis for liability under § 1983. *Clark v. Link*, 855 F.2d 156, 161-63 (4th Cir. 1988); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985) (". . . an alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the statute is guaranteed under the United States Constitution."). Moreover, as the Supreme Court has emphasized, "§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 109 S.Ct. 1865, 1870 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979)).

14

*First Amendment Claim*

In Count III of her Second Amended Complaint, Spencer alleges that "she was subjected to increased harassment by the defendants and [that] she was advised that she would received [sic] no back-up if she was on patrol and encountered trouble," after she told Captain Larry Kasa of the EPD's Uniform Division "of instances of police brutality." Thus, Spencer alleges, she was "punished for exercising her right to freedom of speech." (Second Amended Complaint, Count III, ¶ 2.) Spencer has since attempted to expand her First Amendment claim by asserting in her brief that the speech for which she was subjected to retribution also included "disclosure that a police officer [was] abusing the public trust by charging taxpayer [sic] for overtime which he did not work," as well as "disclosure that some officers on the midnight shift were engaging in conduct ('clicking' of their microphones while another officer is transmitting) which endangered the lives of other police officers." (Plaintiff's Brief in Opposition, pp. 15-16.) Although Spencer evidently discussed these matters with Captain Kasa, they are beyond the scope of the First Amendment claim framed by her pleadings and will not be considered.

The First Amendment "protects public employees from retribution for speech that touches on a matter of public concern, provided that the employee's interest in expressing herself is not 'outweighed by any injury the speech could cause to "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."'" *Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994) (quoting *Pickering v. Board of Regents*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968)); *see Waters*

15

*v. Churchill*, ___ U.S. ___, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).

The threshold inquiry, which involves a question of law, is whether the employee's speech is protected. *Waters*, 114 S.Ct. at 1884; *Connick*, 461 U.S. at 148 n. 7 & 150 n. 10; *Cliff v. Bd. of Sch. Com'rs of City of Indianapolis*, 42 F.3d 403, 409 (7th Cir. 1994); *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1499-1500 (7th Cir. 1994); *Propst*, 39 F.3d at 152; *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994). A public employee's speech will be considered protected if: "(1) it touches upon a matter of public concern, and (2) the employee's interest in expressing herself on this matter outweighs any injury the speech could cause to the State employer's interest 'in promoting the efficiency of the public services it performs through its employees.'" *Wright*, 40 F.3d at 1500 (quoting *Waters*, 114 S.Ct. at 1884). These standards must be applied to each instance of speech for which the plaintiff was allegedly punished in order to determine its protected status. *Wright*, 40 F.3d at 1499.

To determine whether the speech involves a matter of public concern, the court must consider the "content, form, and context" of the statements "as revealed by the whole record." *Connick*, 461 U.S. at 147-48, 103 S.Ct. at 1690-91; *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994); *Cromley v. Bd. of Educ. of Lockport H. S. D. 205*, 17 F.3d 1059, 1067 (7th Cir. 1994). Of these three considerations, content is the most important. *Cliff*, 42 F.3d at 409; *Marshall*, 32 F.3d at 1219; *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1988). "The motive which underlies an employee's statements is a relevant but not necessarily dispositive factor." *Cliff*, 42 F.3d at 409; *Marshall*, 32 F.3d at 1219; *Colburn v. Trustees of*

*Indiana Univ.*, 973 F.2d 581, 586 (7th Cir. 1992). Moreover, "[t]he fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [her] remarks on that subject protected." *Smith*, 28 F.3d at 651; *Hartman v. Board of Trustees of Community College District 508*, 4 F.3d 465, 471 (7th Cir. 1993). Rather, the court must take into account "[t]he content and form of the employee's remarks, along with the underlying circumstances, including the employee's reasons for speaking." *Smith*, 28 F.3d at 651. The court's inquiry must examine "'the *point* of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" *Smith*, 28 F.3d at 651 (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985)).

The evidence shows that Spencer arranged to meet privately with Captain Kasa during the third week of April, 1990. Her deposition testimony suggests that her purpose in meeting with Kasa was to inform him about "what things the officers were doing on midnights" (Spencer Dep. I, p. 26.) Spencer testified that she arranged to meet privately with Kasa at a Goshen restaurant, rather than in his office, because she "didn't want to put [herself] in a position for everybody to know that [she] was in there telling things that were going on on the midnight shift with certain people." (Spencer Dep. I, p. 26.) During their conversation, which lasted for one and one-half hours, Spencer described one incident in March, 1990, when another officer called for assistance and indicated that he was involved in a chase. (Spencer Dep. I, p. 21.) Upon responding to the call, Spencer arrived at the scene to find that three other officers had captured the subject and had just taken him to the ground. Spencer testified that one of the officers "had him face down in the snow, put her knee in his back, handcuffed him," and that

the other two officers "stood there and kicked him in the head and called him nigger continuously." (Spencer Dep. I, p. 22.) Spencer further stated that "they finally got up off the guy, stood him up, [and] took a couple sucker punches to his abdomen." (Spencer Dep. I, p. 22.) Spencer also told Kasa of another incident that occurred a week later when one of the same officers "pushed a man's head through a glass door in detention." (Spencer Dep. I, p. 26.)

During her meeting with Kasa, Spencer also complained about being "clicked" (depressing the microphone button on a radio while another party is attempting to transmit, thereby interfering with their communication) by other EPD patrol officers while she was on duty; indicated her belief that other EPD patrol officers could not be relied upon to back her up; complained that EPD patrol officers would not communicate with her while on duty; and informed Kasa that some EPD officers were forging and falsifying overtime slips. She also told Kasa about a tape recording of a phone call received by Officer Kraus, in which an EPD patrol officer laughed and stated "you're pathetic."

There can be little doubt that the issue of "police brutality," as Spencer now characterizes it, would be a subject of public interest. However, based upon a review of the record as a whole, the court is convinced that Spencer's statements to Kasa about the two incidents in March were not matters of public concern subject to First Amendment protection. *See Smith*, 28 F.3d at 652. Spencer chose to express her concerns about the behavior of certain officers on the midnight shift in a private meeting with Kasa. *See Smith*, 28 F.3d at 652; *Colburn*, 973 F.2d at 587-88; *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987). The evidence suggests that she used the occasion to raise personal complaints about her treatment by fellow officers, and there is nothing to indicate that she was speaking on behalf of others. The

18

context and form of Spencer's speech indicates that a personal matter was at issue. *Phares v. Gustafson*, 856 F.2d 1003, 1008 (7th Cir. 1988). Kasa was not a representative of the media, the mayor, a member of the city council, or even the chief of police; he was in charge of the EPD's Uniform Division. Although Spencer was present and witnessed part of the first incident in March, she waited until the third week in April to bring either incident to Kasa's attention, and she had recently filed a grievance after being placed on desk duty. From all that has been shown, Spencer's objective was to register her personal complaints about the actions and conduct of particular officers on the midnight shift. Because the court finds, as a matter of law, that Spencer's statements to Kasa about the two incidents in March did not involve matters of public concern, it need not reach the balancing test described in *Pickering*.

Even if Spencer's statements to Kasa about the two incidents could have involved matters of public concern, the evidence before the court fails to demonstrate that the defendants retaliated against Spencer for that speech. *See Barkoo v. Melby*, 901 F.2d 613, 620-21 (7th Cir. 1990). In her Second Amended Complaint, Spencer alleges that after she told Kasa "of instances of police brutality" she was "subjected to increased harassment by the defendants and . . . advised that she would received [sic] no back up if she was on patrol and encountered trouble." (Second Amended Complaint, Count III, ¶ 2.) Spencer's response to defendants' motion for summary judgment, however, makes no mention of having been told that she would receive no back up if she encountered trouble while on patrol, nor does it refer to any specific evidence of "increased harassment" by the defendants resulting from her statements to Kasa about the alleged incidents of "police brutality."

Although Spencer's arguments in opposition to summary judgment refer to an instance in May, 1990, in which Assistant Chief Balyeat was overheard telling other officers "that they (administration) were going to get her job because she was making waves about use of excessive force, lack of discipline on the force, unfair promotions and sexual harassment," there is still no evidence linking Spencer's conversation with Kasa to any identifiable instances of retaliation by any of the named defendants.  While she argues that "[a] jury could reasonably infer that the meeting with Kasa and the information disclosed was a motivating factor in [her] assignment [to] desk duty" (Plaintiff's Brief in Opposition to Summary Judgment Motions, p. 16), the evidence shows that she was assigned to desk duty on April 5, 1990 (Plaintiff's Affidavit, ¶ 39), and did not have her conversation with Kasa until the third week of April, 1990.  (Spencer Dep. I, pp. 27-28.)  Because Spencer's assignment to desk duty pre-dated her conversation with Kasa, it could not have been in retaliation for her statements to Kasa.  The fact that Spencer did not raise her speech claim until her Second Amended Complaint further suggests, as the court observed in *Barkoo*, that she did not consider it "a major contributing factor to any disciplinary actions taken by the defendants."  *Id.* at 620.  In the absence of any evidence linking the perceived "retaliation" to Spencer's conversation with Kasa, and her reference to the two instances of alleged "police brutality" in particular, defendants are entitled to summary judgment on her First Amendment claim.

*Due Process Claims*

In Count IV of her Second Amended Complaint, Spencer alleges that the defendants violated her rights under the Due Process Clause of the Fourteenth Amendment "by depriving her of certain benefits to which she was entitled as a police officer without providing procedural fairness and contrary to the rules and usage of EPD." Based upon the discussion in her brief, it appears that there are generally two parts to Spencer's due process claim: (1) that her termination was "discriminatory," because she was punished more severely for rule violations than white male EPD officers; and (2) that she was deprived of her property interest in her position because the City, through its Board of Public Safety, considered matters which were not included in the notice which advised her of the charges she would have to meet at her termination hearing.

The evidence shows that on November 2, 1990, Captain Larry Kasa of the EPD's Uniform Division forwarded a letter to Spencer informing her that an investigation had been undertaken and that she could be subjected to disciplinary action. Spencer was ordered to submit a report explaining her part with respect to five listed violations. The letter specifically referred to a violation of departmental sick policy and included the following:

> On June 21, 1990 you called in reporting you were sick and could not report for work. This was at 2000 hours. It is alleged that at 2229 hours on that same date you assisted two Mishawaka Police Officers with the arrest of an Intoxicated Driver.

(City's Ex. XX-1.)

On November 6, 1990, Spencer submitted a written statement responding to Kasa's letter of November 2, 1990. In her response, Spencer objected to the department's delay

21

in bringing the charges, asserting that her defense to the allegations had been seriously handicapped and that the charges had been brought for the purpose of harassment.  With regard to the alleged violation of the EPD's sick policy, Spencer acknowledged that she had called in sick on June 21, 1990, but indicated that "[l]ater in the evening something came up and [she] had to leave home for a while."  Spencer further indicated that while she was out, she was nearly hit by another vehicle which then proceeded to run yet another vehicle off the road. Suspecting a possible drunk driver, Spencer reported the matter to a Mishawaka police unit which she saw at a stoplight.  Spencer indicated that she returned home after reporting the situation to the Mishawaka unit.  (City's Ex. YY-1.)

In a separate letter to Kasa, also dated November 6, 1990, Spencer stated as follows:

> Enclosed you will find a letter from my physician stating that I should not work until my medical problems are cleared up.  I am sure that you are already aware of my problems due to stress.  You advised me in our last phone conversation that I was out of sick time.  I informed my physician of that and he stated that I still should not work.  I advised him that I had compensatory time coming.  I am requesting that you make the necessary adjustments to fill the days that are not covered by sick time into CT.  I also have my vacation time scheduled for November.  Thank you for your cooperation.

(City's Ex. AAA-1.)

On November 7, 1990, Chief Ivory sent the following letter to the Elkhart Board of Public Safety:

> It is my desire to invoke Article 13, Section 1, of our current contract or working terms, which requires a statement from a physician, approved by the Department, specifying the nature of the illness, injury or accident preventing a police officer from performing his or her duties. The cost of the doctor's visit, in order to obtain the physician's statement shall be paid by the police officer.

22

Attached you will find copies of Officer Princess Spencer's 1989-1990 attendance records to date.

It is our opinion that Officer Spencer is in fact, abusing the sick leave policy. Many things have occurred relating back to as early as 1990 when there appeared to be excessive sickness on her part.

As of this date, Officer Princess Spencer shows a negative balance of twelve (12) hours of sick time. This has been the fifth straight day she has called in sick. Since being re-assigned to the 11 pm to 7 am shift, she has not worked one day. The Department received a letter from Doctor R.M. Abel dated November 6th, 1990: presumably he is her physician.

It is our desire to bring this situation under control. If this officer is found to be in violation we will request her dismissal. This officer has caused undue stress, work, and hardship on the rest of the personnel of the shift and also on the police administration.

(City's BBB-1.)

On November 9, 1990, Assistant Chief and Internal Affairs Officer Thomas K.

Balyeat forwarded a letter to Chief Ivory stating as follows:

November 9, 1990 I received information from Internal Affairs Captain Hemmerlein of the South Bend Police Department, that our Officer Princess Spencer rode with South Bend Police Officer Bill Kraus on Saturday evening November 3, 1990 for an entire shift which ended November 4th in the a.m.

Officer Spencer called in sick to this Police Department November 3rd, and November 4, 1990. We have since gotten a letter from Doctor Abel, her attending physician, stating she is being treated for cardiac irregularity. She has sent a letter to Captain Kasa complaining of her stress problems. Was her ride-a-long with a South Bend Police Officer an aid to her cardiac and stress problems?

It is my suggestion that she be brought before the Board of Public Safety for dismissal.

(Plaintiff's Ex. 320.)

Subsequently, in a certified letter to Spencer dated December 13, 1990, Chief Ivory stated as follows:

You are hereby notified that as Chief of Police Department of the City of Elkhart, I am bringing charges against you before the City's Board of Public Safety and requesting that said Board conduct a disciplinary hearing with regard to these charges.

The charge(s) against you are as follows:

1. On Saturday, November 3rd thru November 4th, 1990 you called in sick and did not report for work.

At the same time you called in too sick to work at the Elkhart Police Department, you rode an eight-hour tour of duty with Officer William Kraus of the South Bend Police Department.

2. On Tuesday, November 6, 1990 Uniform Captain Larry Kasa received two (2) letters; one signed by you and the other from Doctor Robert Abel. Both letters conclude that you have medical problems. You stated in your letter that Captain Kasa is also aware of your problems due to stress. Dr. Abel's letter states you should be off work until your medical problems are cleared up.

However, on Saturday, November 10th thru 11th, 1990 you again rode with Officer William Kraus of the South Bend Police Department for the entire tour.

In consideration of these facts, I am requesting that the Board of Public Safety take disciplinary action in the form of termination of your employment with the Police Department.

I will be forwarding to the Board of Public Safety verification of the above incidents.

I am further requesting the City's Board of Public Safety set this matter for hearing at its earliest convenience. You will be notified by the Board of the date and time of the hearing. At such hearing you will be entitled to be present and to be represented by counsel. You will be entitled to call and cross examine witnesses, and to require the production of evidence, have subpoenas issued, served, and executed within Elkhart County.

24

(Plaintiff's Ex. 321-22.)

Thereafter, in a letter to Spencer dated December 18, 1990, Dick Moore, President of the Board of Public Safety, advised as follows:

> As communicated to you in his letter of December 13, 1990 Police Chief Jerome Ivory has preferred certain charges against you and has requested the Board of Public Safety convene a disciplinary hearing with regard to such charges.
>
> Chief Ivory has further recommended that if the Board finds you guilty of the violations as mentioned that you be terminated from employment with the City of Elkhart Police Department.
>
> In light of this action taken by Chief Ivory please be advised of the following:
>
> > 1. The charges which have been preferred against you are as follows: Violation of Rules (Indiana Code 36-8-3-4 (2) (A) and (H)).
> >
> > 2. The specific conduct which comprises those charges as set forth in the Chief's letter to you, is as follows: See the attached copy of Chief's letter of December 13, 1990.
> >
> > 3. In considering these charges, if the Board of Public Safety determines that you were at fault it will take into consideration your previous service record, together with your previous disciplinary record within the Elkhart Police Department in determining the appropriate sanctions to be applied.
> >
> > 4. You have the right to demand a formal hearing before the Board of Public Safety with regard to these matters. This demand must be in writing and either mailed or hand delivered to the BOARD OF PUBLIC SAFETY, 229 S. 2nd Street, Elkhart, IN 46516.
> >
> > The written request must be made within fifteen (15) days of your receipt of this letter.
> >
> > 5. Upon receipt of your written demand for a hearing herein, the Board will notify you of the date, time and place of such hearing.

6. At such hearing, you will be entitled to be present and you will be entitled to be represented by counsel.

.7. You will be entitled to call and to cross examine witnesses at such hearing.

8. For such hearing you will be entitled to require the production of evidence.

9. You will also be entitled at such hearing to have subpoenas issued, served and executed in Elkhart County.

10. In the event you choose not to make a demand for a formal hearing as set forth hereinabove, the Board will proceed to consider this matter and the charges against you without a formal hearing.

(emphasis supplied) (Plaintiff's Ex. 323-24.)

Pursuant to a written demand by Spencer's counsel, the Board of Public Safety held an administrative hearing on February 28, 1991, to determine whether she was guilty of the alleged rule violations. During the hearing, which lasted over four hours, Spencer was represented by two attorneys, one of whom had been representing her on employment issues with the City since prior to April, 1990. (Spencer Dep. III, pp. 246-47) Spencer was also allowed to testify on her own behalf, call witnesses, and cross-examine adverse witnesses. (Spencer Dep. III, pp. 246-48; Plaintiff's Ex. 328-37; Defendant's Ex., Vol. II, Tab 4, Ex. B-7-15).

At a special public meeting held on March 19, 1991, the Board presented its findings of fact and order. In its decision, the Board found Spencer guilty of violating IND. CODE 36-8-3-4 Article 2(a) & (h) entitled "Neglect of Duty" and "Conduct Unbecoming an Officer." More particularly, the Board determined that:

> on November 3 and 4, 1990, after calling in sick [Spencer] rode in a South Bend, Indiana squad for an entire shift, the same shift she would have been on in Elkhart had she worked, and again on November 10 and 11 she repeated the ride for the same shift in South Bend while on sick leave from the Elkhart department.

(Plaintiff's Ex. 337.) After finding that Spencer's neglect of duty on the occasion in question was "part of a pattern of problems she has had while on the Police Force," the Board concluded that Spencer's termination was warranted and ordered that her employment with the City be terminated, effective immediately. (Plaintiff's Ex. 337.) In its order, the Board also advised Spencer that she had "thirty (30) days in which to appeal [its] decision to the Superior or Circuit Court of Elkhart County pursuant to Indiana Code 36-8-3-4 if she should choose to do so." Spencer, however, did not avail herself of a post-termination appeal. (City's Exs. B-14; B-15.)

Preliminarily, the court notes that Spencer's assertion that her termination was "discriminatory" because she was punished more severely than white male EPD officers appears to be more in the nature of an equal protection challenge, yet none of the evidence identified in her Amended Statement of Material Facts demonstrates that she was punished more severely than *similarly* situated white or male EPD officers, *see Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992); *Sims v. Mulcahy*, 902 F.2d 524, 540-41 (7th Cir. 1990), or that any differences with respect to punishment were the product of *intentional* discrimination. *See Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1221 (7th Cir. 1994).

Spencer's discriminatory punishment claim would fare no better if viewed as a substantive due process challenge. In *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc), the Eleventh Circuit held that a pretextual adverse job action claim implicates only procedural, rather than substantive, due process. *See Narey v. Dean,* 32 F.3d 1521, 1527 (11th

Cir. 1994). Similarly, in *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir.

1992), the Sixth Circuit has held that a state-created property interest in public employment "is

not a fundamental interest protected by substantive due process." It should also be noted that

the availability of adequate remedies for discriminatory employment actions under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*, as well as through an equal

protection challenge raised under 42 U.S.C. § 1983, obviate any need to examine such claims

in the context of substantive due process. But even beyond these concerns, the evidence in the

present case would not support a finding that Spencer's termination was arbitrary or capricious.

*See Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1472 (7th Cir. 1990); *Swank v. Smart*, 898

F.2d 1247, 1252-53 (7th Cir. 1990).

Evaluating a procedural due process claim entails a two-step inquiry. *Board of

Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *New

Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir. 1990). Initially,

the court must determine whether there was a deprivation of a protected interest. If so, the court

must "ascertain whether the procedures attendant upon the deprivation were constitutionally

sufficient." *Vukadinovich v. Bd. of School Trustees of Mich.*, 978 F.2d 403, 410 (7th Cir.

1992); *Forbes v. Trigg*, 976 F.2d 308 (7th Cir. 1992).

As for the first inquiry, defendants acknowledge that Spencer had a

constitutionally protected property interest in her employment with the EPD, pursuant to IND.

CODE §§ 36-8-3-4 and 36-8-3-4.1. *See Smith*, 910 F.2d at 1471 n. 4 (recognizing that IND.

CODE 36-8-3-4 creates a property interest for suspended police officer); *Parrett v. City of

Connersville, Ind.*, 737 F.2d 690, 694 (7th Cir. 1984) (recognizing creation of property interest

under predecessor statute in context of dismissal); *Kennedy v. McCarty*, 778 F.Supp. 1465, 1470 (S.D. Ind. 1991). Accordingly, the court is left to determine whether the procedures accompanying Spencer's termination were constitutionally adequate. *Mathes v. Hornbarger*, 821 F.2d 439, 441 (7th Cir. 1987).

In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 18 (1976), the Supreme Court held that prior to termination a public employee like Spencer "is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." 470 U.S. at 546, 105 S.Ct. at 1495. *See Buttitta v. City of Chicago*, 9 F.3d 1198, 1205 (7th Cir. 1993); *McCammon v. Indiana Department of Financial Institutions*, 972 F.2d 1348 (7th Cir. 1992); *Panozzo v. Rhoads*, 905 F.2d 135 (7th Cir. 1990). The Supreme Court, however, has also pointed out that "'[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). In general, the procedure need not be elaborate and may be satisfied by something less than a full evidentiary hearing prior to adverse administrative action. *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495. Moreover, a pre-termination hearing

> need not resolve definitively all issues surrounding the discharge. When a complete post-termination hearing is provided, the pre-termination hearing need only 'be an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'

*Bakalis v. Golembeski*, 35 F.3d 318, 322 n. 5 (7th Cir. 1994) (quoting *Loudermill*, 470 U.S. at 545-46, 105 S.Ct. at 1495).

These requirements, of course, are constitutional minimums, and the states are free to require more procedural protection, as Indiana has done. But it must be remembered that "[t]he denial of state procedures in and of itself does not create inadequate process under the federal constitution." *Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994). "A violation of state law . . . is not a denial of due process, even if the state law confers a procedural right." *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993).

In this case, it is undisputed that Dick Moore, the President of the Elkhart Board of Public Safety, provided Spencer with written notice of the charges against her in a letter dated December 18, 1990. The letter also advised her of her rights, including the right to a hearing, the right to be represented by counsel at the hearing, the right to cross-examine witnesses at the hearing, and the right to have subpoenas issued for the hearing. (Plaintiff's Ex. 323-24.) The Board's notice complied with IND. CODE 36-8-3-4(c).[2]  Spencer's counsel subsequently

---

[2]At the time in question, IND. CODE 36-8-3-4(c) provided, in part, as follows:

Before a member of a police or fire department may be suspended in excess of ten [10] days, demoted, or dismissed, the safety board shall offer the member an opportunity for a hearing, if demanded. Written notice shall be given either by service upon the member in person or by a copy left at his last and usual place of residence. The notice must state:

    (1) The time and place of the hearing;
    (2) The charges against the member;
    (3) The specific conduct that comprises the charges;
    (4) That the member is entitled to be represented by counsel;
    (5)  That the member is entitled to call and cross-examine witnesses;

demanded a hearing on her behalf, and the Board of Public Safety conducted an administrative hearing on February 28, 1991, to determine whether she was guilty of the charges. During the hearing, which lasted for over four hours, Spencer was represented by two attorneys, and was permitted to introduce exhibits, testify on her own behalf, present other witnesses, and cross-examine the EPD's witnesses. (Spencer Dep. III, pp. 244-45; City's Exs. B-7-8). At a special public meeting held on March 19, 1991, the Board presented its written findings of fact and its order directing Spencer's immediate termination, in accordance with IND. CODE 36-8-3-4(e). (Plaintiff's Ex. 337; City's Ex. B-7-15.) In its order, the Board advised Spencer of her right to appeal its decision to the Superior or Circuit Court of Elkhart County, pursuant to IND. CODE 36-8-3-4(e) and (f). (City's Exs. B-14; B-15.) On the same day, Spencer's attorney called her and advised her of the Board's decision to terminate her employment. (Spencer Dep. III, p. 248.) It is clear that the pre-deprivation procedures which were utilized in this case were more than enough to satisfy the requirements of due process.

Spencer, nevertheless, maintains that she was deprived of her property interest in her position because the Board considered other aspects of her service and disciplinary record, in addition to the noted charges, in deciding to terminate her employment. According to Spencer,

> [t]he Board in its decision makes it clear that the consideration of these matters, which were not included in the notice sent to Spencer by Chief Ivory or the letter sent by the Board of Public Safety setting forth the

---

(6) That the member is entitled to require the production of evidence; and
(7) That the member is entitled to have subpoenas issued, served, and executed in the county where the unit is located.

> specific charges Spencer would have to meet at the hearing, tipped the
> scales in favor of termination.

(Plaintiff's Brief, pp. 12-13.)  This argument, however, overlooks the fact that the Board's

notice letter of December 18, 1990, specifically advised Spencer as follows:

> In considering these charges, if the Board of Public Safety
> determines that you were at fault it will take into consideration your
> previous service record, together with your previous disciplinary record
> within the Elkhart Police Department in determining the appropriate
> sanctions to be applied.

(Plaintiff's Ex. 323-24.)  The Board's notice makes it clear that Spencer's previous service and

disciplinary records with the EPD would be taken into account, not in determining her guilt, but

in "determining the appropriate sanctions to be applied."  The Board's notice was sufficient and

its consideration of Spencer's prior service and disciplinary record was appropriate.

Spencer complains that the disciplinary proceedings were defective in other

respects as well.  In her deposition, Spencer asserted that her attorneys were not allowed to

submit certain documents at the hearing; that she was denied a public hearing; and that she did

not receive notice of the decision to terminate her employment prior to the Board's public

announcement.  (Spencer Dep. III, pp. 247-49.)  However, property deprivations arising from

such random acts do not amount to a due process violation where, as here, adequate post-

deprivation remedies were available.  *Wallace*, 41 F.3d at 302; *Easter House v. Felder*, 910

F.2d 1387, 1408 (7th Cir. 1990); *New Burnham Prairie Homes*, 910 F.2d at 1480; *Fields v.

Durham*, 909 F.2d 94, 99 (4th Cir. 1990), *cert. denied*, ___ U.S. ___, 111 S.Ct. 786, 112

L.Ed.2d 849 (1991); *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 955-56 (7th Cir. 1988).

She could have appealed the Board's decision to state court under IND. CODE § 36-8-3-4(f)-(k).

Spencer has failed to demonstrate a due process violation with respect to her termination.

To the extent that Spencer may also be claiming that her right to due process was violated by her assignment to desk duty prior to her termination, there is no indication that she had a protected property interest in a specific assignment. *See Confederation of Police v. Chicago*, 547 F.2d 375, 376 (7th Cir. 1977) (police officer has no property interest in conditions of employment); *see also Moore v. Martin*, 764 F.Supp. 1298, 1305 (N.D. Ill. 1991). Spencer's further claim that she was deprived of certain benefits associated with her employment, such as pay, insurance and sick time, is likewise without merit. "[A]n interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can be and should be redressed by a state breach of contract action and not by a federal action under section 1983." *Ramsey v. Board of Educ. of Whitley County, Ky.*, 844 F.2d 1268, 1274-75 (6th Cir. 1988); *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2nd Cir. 1987). Defendants are entitled to summary judgment on all of Spencer's due process claims.

*Equal Protection Claims*

Spencer's claims of racial and sexual discrimination and harassment are actionable under § 1983 as violations of the Equal Protection Clause of the Fourteenth Amendment. *Noland*, 39 F.3d at 271; *Annis v. County of Westchester*, 36 F.3d 251, 254 (2nd Cir. 1994); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2nd Cir. 1994); *Saupaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143-44 (2nd Cir. 1993); *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990); *Starrett v. Wadley*, 876

F.2d 808, 814-15 (10th Cir. 1989); *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1186 (7th Cir. 1986).

To establish a *prima facie* case of racial and sexual discrimination violative of the Fourteenth Amendment under § 1983, Spencer must prove that "she is a member of a protected class, that ... she is otherwise similarly situated to members of the unprotected class, and that ... she was treated differently from members of the unprotected class." *Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir. 1987) (quoting *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir. 1985)); *see McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993); *Sims*, 902 F.2d at 538; *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989).

With certain exceptions, the standards for evaluating an equal protection claim based upon harassment in the work place are the same as those for evaluating a claim under Title VII. *King v. Board of Regents of Univ. of Wisconsin Systems*, 898 F.2d 533, 537 (7th Cir. 1990); *Kelly v. Municipal Court of Marion County*, 852 F.Supp. 724, 737 (S.D. Ind. 1994). The Equal Protection Clause, like Title VII, "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), and it prohibits discriminatory conduct having "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (internal quotations omitted.) *Id.*; *see Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Chambers v. American Trans*

34

*Air, Inc.*, 17 F.3d 998, 1004 (7th Cir. 1994); *Rodgers*, 12 F.3d at 673; *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

In *Harris v. Forklift Sys., Inc.*, 114 S.Ct. 367 (1993), the Supreme Court indicated that the determination whether an environment is "hostile" or "abusive" can be made only by looking at all of the circumstances in a given case. Relevant factors, according to the Court, "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 371. While the effect of the conduct on the employee's psychological well-being is "relevant to determining whether the plaintiff actually found the environment abusive," the Court observed, "no single factor is required." *Id. See Dey v. Colt Construction & Development Co.*, 28 F.3d 1446 (7th Cir. 1994); *Saxton*, 10 F.3d at 534; *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271-72 (7th Cir. 1991).

The Court in *Harris*, while considering an action under Title VII, also made it clear that these factors must be evaluated from both an objective and subjective viewpoint:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the condition of the victim's employment, and there is no Title VII violation.

*Id.* at 370. A court, therefore, must "consider not only the actual effect of the harasser's conduct on his victim, but also the effect similar conduct would have had on a reasonable person in the plaintiff's position." *Dey*, 28 F.3d at 1454; *Rodgers*, 12 F.3d at 674; *Saxton*, 10 F.3d at 534; *Daniels*, 937 F.2d at 1271-72.

Although the same considerations generally apply to equal protection claims brought under § 1983, the Seventh Circuit has recognized that "[i]ntent to discriminate must be shown under equal protection while Title VII requires no such showing." *Trautvetter*, 916 F.2d at 1149. Thus, "a plaintiff wishing to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens. . . ." *Id*; *Bohen*, 799 F.2d at 1187. In addition, a plaintiff asserting a sexual harassment claim under § 1983 must establish that the defendant was acting under color of state law. *Noland*, 39 F.3d at 271; *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993); *Redpath v. City of Overland Park*, 857 F.Supp. 1448, 1462 (D. Kan. 1994); *Poulsen v. City of North Tonawanda, N.Y.*, 811 F.Supp. 884, 894 (W.D.N.Y. 1993); *Barnard v. The City of Chicago Heights*, 1991 U.S. Dist. LEXIS 16134 (N.D. Ill. Oct. 22, 1992); *Thomas v. Cannon*, 751 F.Supp. 765 (N.D. Ill. 1990); *Murphy v. Chicago Transit Authority*, 638 F.Supp. 464, 468 (N.D. Ill. 1986); *see also Lawline v. American Bar Ass'n*, 956 F.2d 1378, 1384 (7th Cir. 1992); *Gibson v. City of Chicago*, 910 F.2d 1510, 1516-17 (7th Cir. 1990).

## A. Racial Discrimination and Racial Harassment

Spencer has failed to demonstrate the existence of a triable issue of fact with respect to her claims of racial discrimination and harassment. In her Amended Statement of Material Facts, Spencer indicates that after she returned from the police academy her race

36

became an issue among members of the EPD.  According to Spencer, "[t]hey inquired as to whether she was black or white." (Amended Statement of Material Facts, ¶ 4.) Spencer also indicates that after completing field training in approximately November, 1987, she "began to receive a series of cards mailed to her at the EPD and at her home which made derogatory and demeaning references to her race (black), physical features ('fat lips') and her loyalty to other EPD police officers if there was trouble in black neighborhoods ('whose side are you going to be on')." Spencer states that the first card she received was hand delivered to her at the EPD by Frank Owens prior to a briefing in 1988. Upon handing her the card, Owens said that "he thought she should read the card before briefing so that she would not be embarrassed in briefing." Spencer indicates that when she subsequently met with Captain Kasa and showed him the card, he "sort of chuckled and asked her if she knew who sent the card and to let him know if she received any more." According to Spencer, "Captain Kasa took no action to investigate the matter." (Amended Statement of Material Facts, ¶ 9.) At a later point in her statement of material facts, Spencer states:

> In 1988 in the report room of the EPD, before John Ivory became chief of police, Spencer told him about the racially derogatory mail she had received and also told him that she thought that certain members of the EPD were responsible.  He told Spencer not to let the 'prejudice motherfuckers get to her.'  When he became Chief he did not investigate even after he was told by Ernie Hill that Spencer was being harassed by members of his administration.

(Statement of Material Facts, ¶ 62.) At another point in her statement of material facts, Spencer indicates that "while sitting in the report room one night Owens and other officers were talking about their sexual conquests and Owens turned and looked at Spencer and said that I bet that dark stuff is pretty good." (Amended Statement of Material Facts, ¶ 10.) Spencer's statement

of material facts contain no other references to any actions or statements relating to a racial matter.

None of the evidence which Spencer has identified, however, suggests that race was a substantial or motivating factor in any adverse employment action. There is no indication that race was involved in any way with her job assignments, her receipt of benefits or promotions, discipline, or her termination. Nor has Spencer shown that any of the noted statements and events of a racial nature, while inappropriate and offensive, were so severe or pervasive as to alter the conditions of her employment or create an objectively hostile work environment.

It is also apparent that any claim of racial discrimination or harassment relating to the letters would be barred by the statute of limitations. From all indications, Spencer received the letters referred to in her Amended Statement of Material Facts some time in 1988. One of the letters was postmarked March 23, 1988 (Plaintiff's Ex. 416), and the other was postmarked April 1, 1988 (Plaintiff's Ex. 415). Spencer, however, did not file suit until May 20, 1991, well beyond the applicable two-year period of limitations for § 1983 actions brought in Indiana. *See Wilson v. Garcia*, 471 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Moore v. State of Ind.*, 999 F.2d 1125, 1129 (7th Cir. 1993); *Loy v. Clamme*, 804 F.2d 405, 408 (7th Cir. 1986). And, nothing in this case would support application of the continuing violation doctrine. *See Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 445-46 (7th Cir. 1994). Defendants are entitled to summary judgment on all of Spencer's racial discrimination and racial harassment claims.

B.  Disparate Treatment Based on Sex


Spencer has also failed to demonstrate the existence of a triable issue of fact with respect to her claims of disparate treatment based on sex.  She has presented a laundry list of miscellaneous employment-related matters in which she allegedly received disparate treatment on the basis of her sex, including the denial of a promotion of patrol officer to sergeant, denial of assignment as field training officer; denial of assignment to the K-9 Unit; the fact that she was not selected to attend polygraph or accident reconstruction school; her suspension following a court incident; her suspension for insubordination; the fact that she was subjected to discipline for use of excessive force; that her name was not placed on the officer of the month plaque; and her non-receipt of comp time (CT).  Spencer, however, has identified no admissible evidence in her Amended Statement of Material Facts suggesting that her sex was an issue or motivating factor in any of these employment actions.  Indeed, she can point to no admissible evidence of similarly situated male EPD officers who received more favorable treatment or consideration under like or similar circumstances, and she has not identified any evidence suggesting that any perceived differences in treatment were due to intentional discrimination on the basis of her sex.  Defendants, accordingly, are entitled to summary judgment on all of Spencer's claims alleging disparate treatment on the basis of her sex.

## C. Individual Defendants

Individual liability under § 1983, regardless of the particular constitutional theory, must be based upon personal responsibility. *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984). In *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983), the Seventh Circuit emphasized that "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (emphasis in original.) *See Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986); *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982); *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir. 1971). An official is personally involved if (a) he participates directly in the constitutional deprivation, (b) he acts or fails to act with reckless disregard of the plaintiff's constitutional rights, or (c) the conduct that deprived the plaintiff of his constitutional rights occurred at the official's direction or with his knowledge and consent. *Rascon*, 803 F.2d at 274; *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985); *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). "It is not sufficient for a section 1983 plaintiff to show that a supervisory official was remiss in supervising the implementation of policy in force in an institution. Rather, to establish a claim against a supervisory official, there must be a showing that the official knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act." *Rascon*, 803 F.2d at 273-74.

Mayor Perron

James P. Perron was Mayor of Elkhart throughout Spencer's employment as a patrol officer with the EPD. In her Supplemental Complaint, Spencer alleges that "Perron, as Mayor, was under a duty to enforce the ordinances of the City and the statutes of the State to supervise subordinate officers of EPD;" that he "knew or should have known of the wrongs done;" that he had "the power to prevent or aid in the prevention of the commission of such wrongs, but neglected or refused to do so;" and that he "directly or indirectly under color of law, ordinance, statute and custom, ratified the unlawful, deliberate and reckless disregard of plaintiff's civil rights as embarked upon by the other defendants." (Supplemental Complaint, ¶¶ 21 and 22.)

Spencer, however, has produced no evidence that she ever talked to or communicated with Mayor Perron, or that he was otherwise ever made aware of any alleged acts of discrimination or harassment. Spencer has produced nothing to suggest that Perron participated directly in any discriminatory or harassing conduct; that he acted or failed to act with reckless disregard of her constitutional rights; or that any of the alleged acts of discrimination or harassment directed against her occurred at his direction or with his knowledge and consent. As the Seventh Circuit observed in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983." *Id.* at 992. Mayor Perron is entitled to summary judgment on all of Spencer's constitutional claims.

Thomas Cutler

Thomas Cutler was Chief of the EPD between February, 1987, and May 21, 1990. Spencer contends that she complained to Cutler about being subjected to discrimination and harassment by other members of the EPD, and that Cutler "did nothing." (Spencer Dep. III, p. 286.) In this regard, Spencer testified that she first complained to Cutler in April, 1987, about a rumor that Spencer was having an affair with her assigned field training officer, Fred Eichorn. Spencer claims that she told Cutler that the rumor was being spread around Elkhart by an individual she identified as Peggy Posthuma. (Spencer Dep. I, pp. 157-59; III, p. 286.) Spencer also indicated that she complained to Cutler in 1987 about sexual innuendos, comments and remarks made by Frank Owens, one of her field training officers. (Spencer Dep. I, p. 159.) Spencer testified that she also complained to Cutler about the cards and letters she received in 1988, which contained racial slurs. She further testified that she informed Cutler in 1989 that Assistant Chief Thomas Balyeat had interfered in her personal and family life. According to Spencer, Balyeat called her mother and contacted Adult Protective Services after being informed by Edith Pasley that Spencer had her mother tied to a bed, that she provided her mother with only one piece of bread a day, and that she was holding her mother hostage. (Spencer Dep. III, p. 288.) In her brief, Spencer also asserts that she was treated differently than male EPD officers in the processing of her grievances. According to Spencer, all of the grievances which she filed with the EPD were disapproved by her Sergeants, Owens and DeWitt, Captain Kasa and Chiefs Cutler and Ivory; that after the grievances were denied by the chief, they were not processed to the grievance board as required by municipal ordinance, as was the case with male

42

officers; and that the grievances were still pending at the time the Board of Public Safety decided to dismiss Spencer from the EPD on March 19, 1991.  (Plaintiff's Brief, p. 25.)

Initially, it is clear that all of Spencer's claims against Cutler arising out of incidents which occurred prior to 1989 are barred by the two-year statute of limitations applicable to § 1983 actions brought in Indiana.  *Moore*, 999 F.2d at 1129; *Loy*, 804 F.2d at 408.  The matters barred include Spencer's claim that Cutler did nothing after she advised him about the rumor being spread by Peggy Posthuma in April, 1987; her claim that Cutler took no action after being advised about the sexual innuendos and remarks made by Frank Owens; and her claim that Cutler failed to act after she advised him about the cards and letters she received in 1988.  All of these matters are clearly outside of the two-year period preceding the filing of Spencer's original Complaint on May 20, 1991.

It is also clear that some of Spencer's complaints had nothing to do with subjects of a racial or sexual nature.  Her complaint about the rumor which was being spread by Peggy Posthuma had nothing to do with her race and it bore no apparent connection to her claim of a sexually hostile work environment created by her male coworkers.  Her further complaint about Assistant Chief Balyeat's alleged interference with her personal life likewise involved no suggestion of racial or sexual discrimination or harassment.

Ultimately, the evidence is insufficient to create a triable issue of fact on the question of whether Cutler intended to discriminate against Spencer on the basis of her race or sex.  When asked in her deposition whether she went to Cutler and complained about any specific fellow officer's treatment, Spencer answered "No."  (Spencer Dep. III, p. 291.)  There is also no admissible evidence suggesting that Cutler's alleged failure to process Spencer's

grievances was a product of intentional discrimination or part of a pattern of harassment, and Spencer has not demonstrated that Cutler treated her differently from similarly situated white or male officers with respect to the resolution or processing of her grievances.  Defendant Cutler is entitled to summary judgment on all of Spencer's claims.

John Ivory

John J. Ivory, an African-American, succeeded Thomas Cutler as Chief of the EPD on May 21, 1990.  Spencer alleges that Chief Ivory was aware of the racial and sexual discrimination and harassment directed against her, that he failed to take appropriate action to correct the situation, and that he discriminated against her when recommending her discharge.

There are relatively few references to Chief Ivory in Spencer's Amended Statement of Material Facts.  In her Amended Statement, Spencer asserts that in 1988, before Ivory became Chief of Police, she told him about the racially derogatory mail she had received and informed him of her belief that "certain members of the EPD were responsible."  (Plaintiff's Amended Statement of Material Facts, ¶ 62.)  According to Spencer, Ivory told her not to let the "prejudiced motherfuckers get to her."  (Plaintiff's Amended Statement of Material Facts, ¶ 62.)  Spencer asserts that when Ivory became Chief he did not investigate even after he had been told by Ernie Hill that she was being harassed by members of Ivory's administration.  (Plaintiff's Amended Statement of Material Facts, ¶ 62.)  Spencer also states that all of the grievances she filed with the EPD were disapproved by her various superiors, including Chief Ivory.  (Plaintiff's Amended Statement of Material Facts, ¶ 36.)  Spencer further indicates that

44

her hardship transfer request to Chief Ivory was denied, whereas white male officers received hardship transfers based on their medical condition and physician recommendations, in situations where an officer trades shifts. (Plaintiff's Amended Statement of Material Facts, ¶ 54.) Lastly, Spencer asserts that Chief Ivory discriminated against her by recommending her termination for riding with William Kraus in South Bend while off sick. Spencer states that there was no policy of the EPD prohibiting an EPD officer, while off on sick leave, from riding as a civilian with another officer in another jurisdiction. (Plaintiff's Amended Statement of Material Facts, ¶ 64.)

The evidence, however, falls far short of demonstrating the existence of a triable issue of fact on Spencer's § 1983 claim against Ivory. The fact that Ivory, after becoming Chief, supposedly failed to take corrective action concerning the mail Spencer had received almost two years before in 1988, and the fact that Ivory, along with others, failed to approve her grievances, does not demonstrate that Ivory acted or failed to act with reckless disregard of Spencer's constitutional rights or that any discriminatory or harassing conduct occurred at his discretion or with his knowledge and consent. Moreover, the court has already determined that Spencer's termination did not violate her right to due process, and there is no evidence that Ivory's conduct in denying Spencer's request for a hardship transfer and his action in recommending her termination was based upon a discriminatory animus. *Sims*, 902 F.2d at 538-39; *Webb v. City of Chester, Ill.*, 813 F.2d 824, 829-30 (7th Cir. 1987); *Minority Police Officers*, 617 F.Supp. at 1348-49. Defendant Ivory is entitled to summary judgment on all of Spencer's claims.

Thomas Balyeat


Thomas Balyeat was Assistant Chief of the EPD during the time Spencer was a patrol officer. Spencer maintains that he was aware of and participated in the discrimination and harassment that was directed against her. Spencer's first encounter with Balyeat occurred in 1987, when he called her into his office to discuss an incident and accident report that she submitted during her field training with Sergeant Owens. According to Spencer, Balyeat advised her that she would have to rewrite the report because she was too honest in her description of the incident. At the time, Balyeat allegedly told her "that she did not belong in law enforcement and that she belonged in bed with her legs up." (Spencer Affidavit, ¶ 22.) Spencer also alleges that Balyeat was aware that she was being "clicked" by other EPD patrol officers when she was on patrol during the midnight shift; that he was aware that she had not received back up from fellow EPD patrol officers; and that he knew she had received the racially derogatory letters.

Spencer also refers to an occasion when Balyeat called her into his office and questioned her about whether she had been at the apartment of Officer Kraus, a fellow EPD patrol officer, while she was on duty. Sergeant John Lerner of the EPD had apparently written a letter to Captain Kasa stating that he had seen Spencer's squad car outside Kraus' apartment. Spencer subsequently received a letter from Kasa informing her that she was under investigation for insubordination and accusing her of giving a false report as to her location. When questioned by Balyeat, both denied that she was at Kraus' apartment.

Spencer also claims that in May, 1990, Sergeant Hill overheard Balyeat state that he was going to get Spencer's job because she was making waves about the use of excessive

46

force, lack of discipline on the force, unfair promotions and sexual harassment. (Hill Affidavit,

¶ 5.)

In support of her claim that Balyeat discriminated against her and treated her

differently than male officers, Spencer describes an incident in November, 1990, when Balyeat

refused to allow her husband to pickup her paycheck.  In her statement of material facts,

Spencer indicates that

> After finally contacting Balyeat by phone he told Spencer that he had a
> certified letter that [sic] for her to pick up.  She told him that she would
> have her husband pick up the letter and the paycheck.  He told her that
> she would have to pick the letter and check up personally.  She asked why
> that would be necessary and he told her that she had to pick it up.  She
> reminded him that her husband had picked the check up before.  Balyeat
> still insisted that Spencer pick up her check.  Spencer's car was in the
> shop at the time and she asked Bill Kraus to give her a ride to the station.
> Spencer and Kraus went to the station and went to the door way of
> Balyeat's office.  Balyeat came from behind his desk and began pushing
> officer Kraus (a South Bend police officer) in the chest and telling him to
> get the hell out of his office.  Spencer told Balyeat that she had come for
> her check and letter.  She also asked Balyeat if he was going to sign her
> overtime slip as a result of being called in to pick up the letter.  He told
> her no.  Spencer asked him if he was refusing to give her [sic] paycheck.
> Balyeat replied yes.  Spencer then left Balyeat's office.  Three days later
> Spencer had her husband pick up the check and letter from the post office.
> As a result of Balyeat's withholding of her paycheck, Spencer's family
> vacation which was to begin on Thanksgiving day was cancelled because
> Spencer did not have any money.

(Plaintiff's Amended Statement of Material Facts, ¶ 18.)

Spencer also complains about being assigned by Balyeat and Lt. Crise to desk duty

on April 5, 1990.  In her brief, Spencer states that Balyeat and Crise supposedly assigned her

to desk duty for the purpose of having her attitude evaluated for a period of no less than 30

days; that she remained on the desk for a period of approximately 3 months; that Crise told her

that she was being assigned to the desk as a result of a meeting she had with Balyeat; and that

Crise also told her that she was being assigned to the desk because Balyeat had received numerous complaints.

To the extent that Spencer is attempting to predicate Balyeat's liability on his remarks in 1987, her claim would be barred by the applicable two-year statute of limitations. Balyeat's alleged statement that Spencer "belonged in bed with her legs up" would, indeed, have been reprehensible, but it is undisputed that the incident in which the statement was made occurred more than two years before Spencer filed her Complaint. The fact that Spencer may have felt intimidated about protesting or complaining about the remark while she was still on probation is not a ground for tolling the limitation period. Nor would the circumstances here support application of the continuous violation doctrine with respect to Spencer's claims against Balyeat. *See Doe* 42 F.3d at 445-46.

Spencer's remaining claims against Balyeat are unavailing. Although she points to examples of allegedly unfair treatment by Balyeat, including her assignment to desk duty, the evidence does not suggest that any of his actions were based upon a discriminatory animus relating to her race or sex. Moreover, none of the evidence identified in Spencer's Amended Statement of Material Facts indicates that Balyeat acted or failed to act with reckless disregard of her constitutional rights, or that any discrimination or harassment directed against her occurred at his direction or with his knowledge or consent. Defendant Balyeat is entitled to summary judgment on all of Spencer's claims.

Larry Kasa


When Spencer first became employed at the EPD, Larry Kasa was the Shift Lieutenant of the Uniform Division. He was subsequently promoted to Captain. Spencer alleges that Kasa was aware of the discrimination and harassment to which she was being subjected, but failed to take appropriate action to correct the situation. Spencer also asserts that Kasa was involved in the disapproval of her grievances, and indicates that following an investigation by Kasa regarding her alleged failure to appear in the Elkhart County Court, she was suspended for five days. She maintains that she was treated differently than male officers of the EPD who were not disciplined for failing to appear in court. (Plaintiff's Amended Statement of Material Facts, ¶¶ 34 and 35.)

The evidence shows that Spencer had a meeting with Captain Kasa in November, 1987. On that occasion, she told him that the field training officer who was assigned to her on the midnight shift, Sergeant Frank Owens, was not providing her with adequate training and was sleeping on the job. In 1988, she began receiving the racially derogatory letters at work and at home. These letters made reference to her race (African-American), physical features (e.g., "fat lips") and her loyalty to fellow patrol officers if they were in trouble in African-American neighborhoods (e.g., "whose side are you going to be on"). She also alleges that after she showed Captain Kasa the racially derogatory letters at this meeting, he looked at the letters, sort of chuckled, asked if she knew who sent them and told her he wanted to know when she received any more.

As discussed previously, Spencer met with Kasa at a restaurant in Goshen during the third week in April, 1990. (*See* pp. 17-18, *supra*.) During that meeting, Spencer complained about being "clicked" by other EPD officers while she was on duty, indicated her belief that other EPD officers could not be relied upon to back her up, complained that EPD patrol officers would not communicate with her while on duty, and informed Kasa that some EPD officers were forging and falsifying overtime slips. She also advised Kasa about a tape recording of a phone call received by Officer Kraus, in which an EPD patrol officer laughed and stated "you're pathetic."

The evidence of record, however, also indicates that action was taken to address a number of Spencer's complaints. In her deposition, she acknowledged that clicking was not approved by the top brass at the EPD; that there was actually a policy against it; that during EPD briefings, both Captain Kasa and Lt. Crise told EPD officers that disciplinary action would be taken against anyone caught clicking; that a letter was sent to all EPD officers advising them to stop clicking; and that it was virtually impossible to identify those individuals who were doing the clicking. Following Spencer's receipt of the racially derogatory letters from unknown members of the EPD in March and April, 1988, Captain Kasa examined the letters for fingerprints in an effort to identify the culprits. Steps were also taken to discipline EPD patrol officers who failed to back up other officers. In one instance, Officer Richard Raeder was given a five-day suspension for failing to back up Spencer. (Spencer Dep. II, pp. 55-62; III, pp. 147-48.)

In her affidavit, Spencer refers to Kasa in connection with an investigation which occurred in May, 1990. In this regard, she states:

> On May 17, 1990 I was the subject of a disciplinary investigation
> wherein it was alleged that I failed to appear in the Elkhart County Court.
> (Ex. 88-92) After investigation by Kasa I was suspended for five (5) days
> for failure to appear in court. (Ex. 38)

(Spencer Affidavit, ¶ 41.)  Spencer further states:

> I was treated differently than male officers of the EPD who had in
> fact, prior to and since my being disciplined, failed to appear in court and
> were not disciplined.

(Spencer Affidavit, ¶ 42.)

The disciplinary investigation referred to by Spencer began after Chief Cutler

received a complaint from Deputy Prosecuting Attorney Lawrence J. Meteiver, indicating that

he was forced to enter into a plea agreement with a defendant in a criminal case when Spencer,

after being provided with a subpoena, informed him on the morning of a scheduled jury trial that

she could not "make the case by herself" and that additional testimony would be required from

Officer Kraus. Meteiver indicated that there was "certainly enough" in Spencer's police report

to make the State's case without the need for additional testimony. In a letter to Cutler dated

May 10, 1990, Meteiver summarized his concerns as follows:

> On the morning of a jury trial, I received a call from the only Officer who
> filed a report in a case saying she can't make the case without additional
> testimony from other officers. With a somewhat less than solid case
> (B.A.C. .10%) and an officer who thinks she can't make the case, I chose
> to plead the case out as a misdemeanor. The case could not be continued
> because the defendant had requested a speedy trial. The jury had been
> called and was assembling. There were other cases which could have
> been tried today. With the backlog we have already, this delay caused
> some concern on Judge Rieckhoff's part and also on my part.
>
> The subpoena [for Spencer] was delivered to Nancy DeWitt on Friday,
> May 4, 1990, well in advance of the trial date and soon enough to allow
> the officer to make contact with me to discuss any problems which she felt
> could change the course of the trial.

In any event, please review this problem with your Uniform Division and any others you feel may be able to help alleviate problems in our already congested court system.

(Plaintiff's Ex. 88; Defendants' Ex. H-1 and 2.)    Following an investigation by Chief Cutler and Kasa, Cutler wrote letters of apology to Judge Rieckhoff and Deputy Prosecutor Meteiver, and suspended Spencer for five days without pay for neglect of duty.  (Plaintiff's Ex. 91.)

Spencer has failed to identify evidence sufficient to establish a triable issue of fact with respect to intentional discrimination or harassment by Kasa.  As the Seventh Circuit observed in *Trautvetter*, "while it is clear that an individual plaintiff may pursue a sexual discrimination claim under the fourteenth amendment based solely upon acts of discrimination directed towards her, it is also clear that such a claim must show an intent to discriminate *because of* her status as a female and not because of characteristics of her gender which are personal to her." (emphasis in original.)  916 F.2d at 1151.  In *Sims*, the court noted that discriminatory intent "implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse affects upon an identifiable group."  902 F.2d at 538 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 60 L.Ed.2d 870, 99 S.Ct. 2282 (1979)).  The record in this case indicates that steps were taken to rectify a number of Spencer's complaints, and there is nothing to suggest that her race or sex was a motivating factor in the handling or disposition of her grievances or the conduct of Kasa's investigation into the court incident.

Spencer insists that she was suspended for failing to appear in court and points to Officer Steven Ambrose as an example of a white male who also failed to make a court appearance but was not suspended.  The evidence, however, shows that Spencer was ultimately

52

suspended, not because she failed to appear, but because she advised the prosecutor on the morning of a scheduled jury trial that additional testimony from another officer would be needed for the State to make its case, after her police report had led the prosecutor to believe that her testimony alone would be sufficient. Spencer points to no similarly situated white or male officers who were not subjected to disciplinary action under like or similar circumstances. Defendant Kasa is entitled to summary judgment on all of Spencer's claims.

Frank Owens

Frank Owens was a Sergeant with the EPD and acted as Spencer's field training officer in the fall of 1987, after she returned from the police academy. Spencer claims that Owens subjected her to discrimination and harassment on the basis of her race and sex. The actions and conduct of Owens, according to Spencer's account, would have been extraordinarily crude and reprehensible, but the fact cannot be avoided that most of the actions attributed to Owens occurred well outside of the two-year period preceding the filing of Spencer's Complaint on May 20, 1991. Based upon Spencer's Amended Statement of Material Facts and affidavit, the only event involving Owens which occurred after May 20, 1989, was a single incident on December 10, 1990. In describing that incident, Spencer stated: "Owens harassed and threatened me when he called me at home and told me that it would be in my best interest not to come back to midnights." (Spencer Affidavit, ¶ 24.)

Spencer's assertion that Owens harassed and threatened her is conclusory, inadmissible, and it cannot be considered in ruling on defendants' Motions for Summary

Judgment. This statement otherwise contains nothing of a racial or sexual nature; it bears no apparent relationship to any of Owens' statements and conduct three years earlier; and it did not create a hostile working environment. *See Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 707-08 (7th Cir. 1995) (seemingly isolated incidents, though involving crude conduct, did not create hostile working environment). Defendant Owens is entitled to summary judgment on all of Spencer's claims.

Robert Crise

Robert Crise was a Lieutenant during Spencer's employment with the EPD. Spencer asserts that Crise made statements and engaged in discriminatory and harassing conduct based on her sex. In her Amended Statement of Material Facts and affidavit, Spencer asserts that shortly after Crise became Shift Lieutenant, he told her in the presence of Captain Kasa that she was "too emotional, too sensitive and the [her] voice was too high pitched," and that on a previous occasion he told her that "females did not belong in law enforcement because they had too many mood changes." (Spencer Affidavit, ¶ 32.)

Spencer also states that she was required to go to Crise personally in order to request comp time (CT), personal, vacation and other time off, as well as tell Crise why she wanted the time off. According to Spencer, male officers on the midnight shift did not have to go to Crise in order to take time off, and she was the only person in the EPD who had to go directly to their Lieutenant in order to take time off. (Spencer Affidavit, ¶ 33.) Spencer also states that before Crise became the midnight Shift Lieutenant, she was the "only female who

annually earned and took more CT than any other officer on the shift;" that "[t]he overwhelming majority of the male officers on the midnight shift received pay for overtime worked;" and that she, "along with the other females on the midnight shift would take CT instead of overtime pay." (Spencer Affidavit, ¶ 34.) Spencer maintains that Crise "discriminated" against her by implementing a special policy known as the "Spencer rule" which prohibited officers from signing up for CT more than 30 days in advance. According to Spencer, Crise said he implemented the rule "because everybody was complaining about me having so much time off and that he had to do something about [it]." Spencer indicates that the "Spencer rule" reduced the CT that she could take even though she had worked the time and had not been paid. She further asserts that Crise "discriminated against and treated [her] differently than anyone else on the shift by requiring [her] to obtain his permission before [she] could take time off." She states that all other officers continued the normal practice of going to their Sergeant and getting time off, and that she was unaware of any policy which would allow her to exchange any accumulated CT for a cash payment. (Spencer Affidavit, ¶ 35.)

In her affidavit, Spencer further states that on November 15, 1988, the day after she had major surgery, Crise "harassed and intimidated" her by coming to her hospital room at the Elkhart General Hospital, handing her an EPD envelop, and telling her that she was to have a response into Captain Kasa by 8:00 a.m. the following morning concerning the fact that she was the subject of an investigation. Spencer states that she was unable to respond to the letter and never received any information as to the result of the investigation. (Spencer Affidavit, ¶ 36.) In late 1989 or early 1990, according to Spencer, Crise "discriminated" against her by

ordering the Sergeants on the shift to follow her while she was on duty.  (Spencer Affidavit, ¶ 37.)

Spencer further states that in 1990, shortly after Officer Kraus was reassigned to the midnight shift, Crise called her and Kraus into his office and told them to avoid each other because other officers on the shift were complaining that Spencer and Kraus were involved in a romantic relationship.  Spencer indicates that she told Crise that Kraus was one of only a couple of officers on the shift who would communicate with her, go to dinner with her, and back her up.  Spencer pointed out that there were male officers who regularly took their dinner and coffee breaks together and backed each other up, and that no one said anything.  According to Spencer, Crise then advised her that he had not received any complaints about anyone else. (Spencer Affidavit, ¶ 38.)

Spencer also states that on April 5, 1990, Balyeat and Crise assigned her to desk duty for the purpose of having her "attitude evaluated for a period of no less than thirty (30) days."  Spencer indicates that she "stayed on the desk" for a period of approximately three months; and that Crise told her she was being assigned to the desk as a result of a meeting he had with Balyeat.  When Spencer asked Crise why she was being assigned to the desk, he advised her that Chief Balyeat had received "numerous complaints;" that they had to evaluate her attitude; and that she would be evaluated daily by the Sergeants.  When Spencer asked Crise what the complaints were and who were the complainants, he told her that Balyeat had not given him that information; that if she wanted that information, she would have to call Balyeat; and that if she wanted to get off the desk, it was Balyeat's decision.  When Spencer inquired as to

whether Crise had received any complaints from the Sergeants and if he had personally received any complaints, his was response was "no." (Spencer Affidavit, ¶ 39.)

The evidence of record again fails to disclose a triable issue of fact on the questions of disparate treatment and sexual harassment. Spencer's conclusory assertions that Crise "harassed" her and "discriminated" against her are inadmissible and cannot be considered in resolving defendants' Motions for Summary Judgment. The same is true of Spencer's vague assertions that during her "tenure" on the EPD, she "refused advances to get involved sexually with other male EPD officers, including Crise, and that "some of [her] supervising officers made unwelcomed sexual advances toward [her] and engaged in verbal and physical conduct of a sexual nature in [her] presence" prior to May, 1990. (Spencer Affidavit, ¶¶ 25 and 26.) These non-specific assertions carry no weight in the present analysis. *See e.g. Koelsch*, 46 F.3d at 708.

The only other matters attributed to Crise which involved anything relating to sex or gender were his statement that Spencer was too emotional and sensitive and that her voice was too high pitched, his remark that females did not belong in law enforcement because they had too many mood changes, and his directive that Spencer and Kraus avoid each other because of complaints and the perception that they were involved in a romantic relationship. These isolated and relatively innocuous statements do not support a finding of sexual harassment. *See e.g. Koelsch*, 46 F.3d at 708 (summary judgment affirmed where two incidents of sexually suggestive and derogatory jokes found insufficient to create hostile work environment); *Saxton*, 10 F.3d at 533-34; *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993). Spencer's various complaints about restrictions on comp time, Crise's delivery of an envelop concerning an

investigation to her in the hospital, her assignment to desk duty, and Crise's directive that she be followed by the Sergeants while on duty, have nothing to do with her sex, and such matters provide no indication of a sexually hostile work environment. Defendant Crise is entitled to summary judgment on all of Spencer's claims.

John Lerner and Tom DeWitt

During Spencer's employment, John Lerner and Tom DeWitt were Sergeants with the EPD. Spencer maintains that both Lerner and DeWitt subjected her to sexual harassment, as well as disparate treatment based on her sex. In order to hold a person liable under § 1983, it must be shown that he or she acted "under color of state law." *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961); *Hughes v. Halifax County School Bd.*, 855 F.2d 183, 186 (7th Cir. 1988); *Volk v. Coler*, 845 F.2d 1422, 1431 (7th Cir. 1988); *Woodward*, 977 F.2d at 1401; *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir. 1991); *Murphy*, 638 F.Supp. at 467. Employment by the municipality is not conclusive in determining whether the person was acting "under color of state law;" but it is relevant. *Murphy*, 638 F.Supp. at 467 (citations omitted). "[A] person acts 'under color of state law' when he engages in conduct that is related to state authority conferred on the person, even though that authority does not in fact permit the conduct." *Id.* at 467-68. The conduct "must bear some similarity to the nature of the powers and duties assigned" to the defendant to hold him or her liable. *Id.*

In this case, the acts of sexual harassment which Spencer has attributed to Lerner and DeWitt bear no similarity to the nature of their job duties as EPD officers. Their alleged

conduct did not relate to any state powers assigned to them. Thus, they were not acting "under color of state law" for purposes of Spencer's claim of sexual harassment under § 1983. *See e.g. Koutselas-McDonald v. Kowal*, 1995 U.S. Dist. LEXIS 2237 (N.D. Ill. Feb. 24, 1995); *Garrison v. Burke*, 1993 U.S. Dist. LEXIS 1318 (N.D. Ill. Feb. 8, 1993). To the extent that Spencer is also claiming that Lerner and DeWitt subjected her to disparate treatment based on her sex, there is no evidence that either defendant accorded different treatment to similarly situated male employees. Defendants Lerner and DeWitt are entitled to summary judgment on all of Spencer's claims.

### D. Claims Against the City of Elkhart

A municipality such as Elkhart cannot be held liable under § 1983 on a theory of *respondeat superior*. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694, 98 S.Ct. at 2037. Only when the municipality itself, through the execution of a policy or custom, causes the alleged constitutional violation, will it be found liable under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Thus, the plaintiff must show a "direct causal link between the municipal policy [or custom] and the constitutional deprivation." *Id.*; *City of Oklahoma City v.*

*Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992).

To determine the existence of a municipal policy or custom, the court must look to "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused" the constitutional deprivation. *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-23, 108 S.Ct. 915, 922-24, 99 L.Ed.2d 107 (1988). The "decisions of an employee without authority to set official policy provide an insufficient basis for the imposition of liability against the governmental entity under section 1983." *McNabola*, 10 F.3d at 510. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986); *see also McNabola*, 10 F.3d at 510; *Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir. 1992); *Woods v. City of Michigan City, Indiana*, 940 F.2d 275, 278 (7th Cir. 1991). This could come in the form of an official policy established by the final policymaking authority commanding the constitutional deprivation to occur or, in the absence of an official policy, where the final policymaking authority knows of the longstanding practice or custom causing the constitutional deprivation, but acquiesces in its continued existence. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723; *McNabola*, 10 F.3d at 509. Ultimately, the court must look to state and local law to determine the identity of the final policymaking authority. *Praprotnik*, 485 U.S. at 123-25, 108 S.Ct. at 924-25; *McNabola*, 10 F.3d at 509; *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1325; *Fiorenzo*, 965 F.2d at 350.

Under Indiana law, final decisions on employment matters involving police personnel rest with the executive branch of the city government. IND. CODE § 36-4-9-6 gives the city executive (mayor) the authority to appoint the chief of the police department and the members of the board of public safety, and IND. CODE §§ 36-8-3-2, 36-8-3-3 and 36-8-3-4 provide the safety board with exclusive control and authority over final employment decisions concerning members of the police department. And, IND. CODE §§ 36-8-3-3 and 36-8-3-4.1 give the police chief "exclusive control of the police department . . . . subject to the rules of the safety board." In this case, the Board and Mayor Perron are final policymakers for purposes of ascertaining the City's liability under § 1983.

There is no evidence of any official policy promulgated by the Board or Mayor Perron permitting discrimination or harassment on the basis of race or sex. In fact, the undisputed evidence is to the contrary. In December, 1980, prior to Spencer's employment, the City adopted Ordinance No. 3262, entitled "An Ordinance To Provide For Equal Opportunities, Training, Compensation, Promotion, And Other Conditions Of Employment Without Regard To Race, Color, Religion, Sex, National Origin, Ancestry, Or Age, Except Where Sex Or Age Are Bona Fide Occupational Requirements." (City's Reply Brief, Appendix 6.) On January 18, 1983, the Board adopted a personnel manual for City employees which contained a policy statement supporting equal employment opportunities with respect to race and sex. (City's Reply Brief, Appendix 5.) And, on May 1, 1990, the Board adopted a "harassment policy," which provided, among other things, as follows:

> The City of Elkhart will not tolerate harassment of its employees in any form by supervisors, co-workers or from any person in the work place. Any form of harassment related to an employee's race, color, sex, sexual orientation, marital status, religion, national origin, age, physical

or mental handicap, or veteran status is a violation of this policy and will
be treated as a disciplinary matter.

(Spencer Dep. III, Ex., R.)  Spencer was also covered by a collective bargaining agreement

which prohibited race and sex discrimination.  (City's Evidence, Vol. II, Tab 14.)  In the

absence of an official policy allowing racial and sexual discrimination and harassment, Spencer

must predicate liability on the existence of a long-standing practice or custom acquiesced in by

the Board or Mayor Perron which constitutes the "'standard operating procedure' of the local

governmental entity."  *Jett*, 491 U.S. at 737, 109 S.Ct. at 2724.

The record, however, contains no evidence of such a long-standing practice or

custom and there is no evidence to suggest that either Mayor Perron or the Board was aware of

and acquiesced in any long-standing practice or custom of racial and sexual discrimination or

harassment.  Although Spencer points to other female officers who claim to have been subjected

to sexual harassment while in the employ of the EPD, and while Spencer claims to have

experienced discrimination and harassment, there is no indication that any of these matters were

brought to the attention of the Mayor or the Board.  It is also undisputed that Spencer had access

to and utilized a formal grievance process, but none of the four grievances she filed appear to

have involved claims of sexual harassment.  (Spencer Dep. I, pp. 192-205.)  Spencer's

supervisors at the EPD did not have authority to establish municipal policy.  *See Auriemma v.

Rice*, 957 F.2d 397, 400-01 (7th Cir. 1992).  Without evidence indicating knowledge and

acquiescence on the part of the Mayor or the Board, she cannot succeed on her claims against

the City.

The record is also devoid of evidence indicating a causal link between any other claimed constitutional deprivation suffered by Spencer and any custom or policy of the City. Under these circumstances, the City is entitled to summary judgment on all of Spencer's claims.

### Defamation and Retaliation Claims

On May 20, 1992, one year after Spencer filed the present action, Mayor Perron spoke at a news conference called in response to civil unrest in Elkhart following the Rodney King verdict in Los Angeles and the arrest of a shooting suspect in Elkhart.  During the press conference, Mayor Perron stressed the City's progress in police-community relations and defended the City's efforts to eradicate police brutality.  He also pointed to the earlier dismissal of Spencer from the EPD and referred to her as "one of the worst perpetrators" of brutality in the EPD.  The Mayor also observed that Spencer was "one of the most notorious brutalizers" in EPD history, adding that it was ironic that Spencer was suing the City to protest her discharge and was alleging, among other things, the wide-spread presence of police brutality.  At the time, Perron was aware that Spencer had been suspended for five days in 1989 for unnecessary force or violence and breaking an arrestee's nose.  He was also aware that the City had settled a law suit arising out of the incident for $50,000 -- the largest amount paid by the City in a police brutality case during his tenure as Mayor.  (Perron Affidavit.)

Spencer was subsequently granted leave to file a Supplemental Complaint adding Counts V and VI against Mayor Perron.  In Count V, Spencer alleges that Perron's remarks about her at the press conference were false and defamatory; that Perron knew the statements

were false; that he made the statements maliciously for the purpose of injuring her personal and professional reputation; that the remarks were subsequently published in local newspapers; and that as a result of the statements, she had sustained a loss to her reputation and suffered emotional damage. Spencer further claims that Perron's statements violated her rights under the Fourteenth Amendment. In Count VI, Spencer alleges that Perron's statements at the news conference were made with the intent to charge her with having engaged in unprofessional and criminal behavior while she was a member of the EPD; that the statements were made maliciously and in retaliation for her exercise of her First Amendment right "to file suit against the City of Elkhart and the Elkhart Police Department;" that the statements represented a continuation of the race and sex discrimination employed against her while she served as a member of the EPD; that the false and malicious statements represented a continuation of the harassment employed against her while she was a member of the EPD; and that she suffered emotional harm and damage as a result of Perron's retaliation.

It is well-established that "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley,* 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) (citing *Paul v. Davis,* 424 U.S. 693, 708-09, 96 S.Ct. 1155, 1164-65, 47 L.Ed.2d 405 91976)). Consequently, to the extent that Spencer is claiming a constitutional violation based upon defamation, her allegations fail to make out a violation of any constitutional right, and Mayor Perron is protected by qualified immunity. *Siegert,* 111 S.Ct. at 1792.

Spencer's retaliation claim against Perron is also without merit. Spencer's Amended Statement of Material Facts does not identify any evidence suggesting that Perron's statements about her at the news conference were false. Moreover, Spencer's law suit against

the City was no secret, and Perron had as much right to comment upon it as Spencer had a right to file it.

It is also clear that any state law claims against Mayor Perron or the City would be barred by the Indiana Tort Claims Act. IND. CODE 34-4-16.5-3 provides, in relevant part, that:

> A *governmental entity* or an *employee* acting within the scope of the employee's employment is not liable if a loss results from:
> * * *
> (6)  The performance of a discretionary function;
> * * *
> (13)  Misrepresentation if unintentional.

(emphasis supplied.)

Perron's participation in the press conference was clearly within the scope of his employment as Mayor and it involved the performance of a discretionary function. Moreover, even if it were assumed that his statements concerning Spencer were false and amounted to misrepresentations, there is still no evidence that any such misrepresentations were intentional. Under Indiana law, the Mayor "enjoys immunity for acts within the scope of his employment and will not be held liable for any errors, mistakes or judgment or unwise decisions he may make in the exercise of that discretion." *Foster v. Pearcy*, 270 Ind. 533, 387 N.E.2d 446, 450 (1979), *cert. denied*, 445 U.S. 960 (1980). Mayor Perron is entitled to summary judgment on all of Spencer's claims under Counts V and VI.

*Conclusion*

For the foregoing reasons, the court finds that there is no genuine issue of material fact and that defendants are entitled to judgment in their favor as a matter of law. Accordingly, defendants' Motions for Summary Judgment are **GRANTED**. The Clerk is directed to enter final judgment in favor of defendants and against the plaintiff on all of the plaintiff's claims.

**SO ORDERED.**

Dated this 26th day of April, 1995.

s/Robin D. Pierce

Robin D. Pierce, U.S. Magistrate Judge

66